UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

    Plaintiff,

v.

NADEEM AHMED MULGADO,

    Defendant.

No. CR 19-00403

**ORDER GRANTING MOTION TO WITHDRAW GUILTY PLEA**

**INTRODUCTION**

Defendant moves to withdraw his guilty plea for illegal re-entry in violation of Section 1326 of Title 8 of the United States Code. He argues he received inadequate legal advice because various grounds for a possible collateral attack went undiscussed with his attorney leading up to his plea. For the foregoing reasons, the motion is **GRANTED.**

**STATEMENT**

The following are the findings of fact by the Court after several sessions of evidentiary hearings with live testimony:

1. Nadeem Ahmed Mulgado was born on July 23, 1982, in Germany. His father, now deceased, was from Pakistan. His mother, Maria Eloisa Ahmed, is from Mexico. She received lawful permanent resident status in the United States in the 1980s through a government amnesty program. Mulgado is not an American citizen and has never had a work visa or green

1    card or amnesty. As a child, however, Mulgado came to live in Turlock, California, with his
2    mother. His primary language is English. He regards the United States as his home.

3    2. On January 13, 1998, Ms. Ahmed, who had a green card, filed a form called Petition
4    for Alien Relative ("I-130") with the Immigration and Naturalization Service (INS) on behalf
5    of her son Nadeem Ahmed Mulgado, our defendant. An I-130 is a form by which an
6    individual who is an American citizen or lawful permanent resident can petition for a relative
7    or spouse who is not a citizen to gain lawful status in the United States. "Approval of the I–
8    130 petition does not automatically entitle the alien to adjustment of status as an immediate
9    relative of a United States citizen." *See Ngongo v. Ashcroft*, 397 F.3d 821, 823 (9th Cir. 2005).
10   The non-citizen relative or spouse subsequently must apply for a green card (and, if within the
11   United States, request an adjustment of status).

12   3. During the pendency of the I-130, the INS sent correspondence to Ms. Ahmed for
13   further information, asking for copies of her own resident alien card and Mulgado's German
14   birth certificate, which she provided. The I-130 was approved on December 2, 1998. This was
15   a necessary but not sufficient step in case Mulgado himself wished to receive a green card.
16   Notification of the approval was mailed to Ms. Ahmed; however, she never received it and
17   took no further action to adjust the status of her son.

18   4. At age 21, Mulgado married an American citizen on March 12, 2004. This marriage
19   had the legal effect of terminating the approved I-130 filed by Ms. Ahmed, because under the
20   immigration laws, when an I-130 is filled out by a parent who is a permanent resident, if the
21   beneficiary subsequently marries before getting a green card or adjusting their status, the
22   approved I-130 is automatically revoked. The non-citizen's spouse would have to file the form
23   anew on behalf of their non-citizen husband or wife. Mulgado has never officially divorced his
24   wife, though they eventually separated. He is still currently married to her. She never filled
25   out an I-130 on his behalf.

26   5. On November 21, 2005, Mulgado and his uncle went to Mexico from Kansas where
27   they were then living. They attempted to return to the United States by car through the
28   Brownsville Veterans Port of Entry in Texas. Mulgado was in the passenger seat of the vehicle

United States District Court
Northern District of California

1  and falsely declared himself to be a United States citizen to the custom border patrol officer.

2  Mulgado presented a false identity — a Kansas driver's license under the name "Victor

3  Antonio Torres" which he had bought from a street vendor eight months prior — and claimed

4  he had been born in California. The officer escorted Mulgado and his uncle to secondary

5  inspection for further inquiry.

6        6. During further questioning by Customs Border Patrol Officer Marvin Prazelini,

7  Mulgado continued to maintain that he was Victor Torres and born in California. Officer

8  Prazelini took Mulgado's fingerprints and ran a search through various databases. After

9  receiving abnormal results on Mulgado's identity, some from "countries of interest," Officer

10 Prazelini contacted the Joint Terrorism Task Force and the FBI. Eventually, the FBI and JTTF

11 advised that Mulgado was not a terrorist or on any watch list. Officer Prazelini then went to

12 the lobby and asked Mulgado's uncle for Mulgado's real name. The uncle advised that his

13 nephew went by "Nadeem."

14       7. When Officer Prazelini confronted Mulgado with his uncle, Mulgado finally

15 admitted he was in fact Nadeem Ahmed Mulgado and was not a United States citizen.

16 Mulgado then stated he was born in Mexico. Officer Prazelini ran Mulgado's real name

17 through a database and located his alien number, which indicated that his country of birth was

18 Germany. When asked about Germany, however, Mulgado insisted that he was not born there

19 and had never been to Germany. He said his mother had once told him there existed

20 documents from Germany under his name, but he had never seen them and only knew of his

21 Mexican birth certificate from Guadalajara. Mulgado misrepresented his place of birth because

22 he feared possible deportation to Germany, a country with which he had never identified.

23       8. Officer Prazelini advised Mulgado of his Miranda rights in English and in Spanish.

24 Mulgado waived his Miranda rights and proceeded without counsel to make a sworn statement.

25 In his statement, Mulgado swore that he was a Mexican citizen and had never had any legal

26 documents to enter or reside in the United States. When asked if his mother or father had ever

27 "petitioned" for him, Mulgado said no. On a Form I-275, Mulgado requested to withdraw his

28 application for admission into the United States, which is a process that allows a non-citizen to

3

voluntarily return to their country of origin without official removal, a process that, if allowed, would have avoided the five-year prohibition on attempted reentry (discussed more below).

9. Officer Prazelini did not explicitly address Mulgado's request to withdraw. Rather, Officer Prazelini processed Mulgado for expedited removal. Pursuant to federal regulation, Mulgado was not entitled to a hearing before an immigration judge or to an appeal of the expedited removal. Mulgado's Form I-275, however, had the wrong boxes checked and indicated that he would see an immigration judge, though never did.

10. The next day, on November 22, 2005, Mulgado pled guilty in the Southern District of Texas to illegally entering the United States by falsely claiming to be a United States citizen in violation of Section 1325(a)(3) of Title 8 of the United States Code. He was represented by an Assistant Federal Public Defender. Judgment was entered and Mulgado was placed on unsupervised probation for one year, with a $10 special assessment. It is unclear the extent to which the federal defender gave any assistance to Mulgado in connection with the INS expedited removal process. On the same day, a Form I-860 Notice and Order of Expedited Removal was filled out by Officer Prazelini and his supervisor, and Mulgado was removed by being walked back across the border. As a result of this removal, Mulgado was prohibited from entering, attempting to enter, or being in the United States for a period of five years from the date of his departure without the Attorney General's express consent.

11. Mulgado's 2005 removal was reinstated twice in August 2007 and November 2013. (However, a Section 1326 conviction does not require any reinstatement.)

12. In July 2019, Mulgado was found in Redwood City after a traffic stop for, *inter alia,* driving under the influence, driving with a suspended license, and possession of a controlled substance. ICE (the successor to the INS) was notified after his fingerprints revealed his prior removals and non-citizen status. Consequently, on August 22, 2019, Mulgado was indicted in the Northern District of California for illegal reentry following removal in violation of Section 1326(b)(1).

13. Federal Public Defender Steve Kalar represented Mulgado with his criminal reentry case. Attorney Kalar discussed in general collateral attacks on the 2005 removal order

4

with Mulgado, but did not identify or advise Mulgado of any particular viable collateral attack defense to his removal. Attorney Kalar advised Mulgado of the advantages of pleading guilty quickly, as prompt acceptance of responsibility can be a basis for downward departure, particularly, he believed (correctly), in front of the undersigned judge. Attorney Kalar did not notice Mulgado's I-130 form or his German birth certificate in his alien file ("A-file") at the time he gave this advice to Mulgado. If Attorney Kalar had noticed those documents in the A-file, he would have done further investigation with his immigration expert colleagues as to any further possible defenses for Mulgado.

14. In December 2019, after being advised by the Court of all the rights he'd be forfeiting, Mulgado voluntarily and freely pled guilty to violating Section 1326. There was no plea agreement. The plea was "open." Mulgado was ordered to appear for sentencing on March 10, 2020.

15. After entering his guilty plea, however, Mulgado absconded and became a fugitive for two and a half years. The case languished until he was apprehended and appeared again in April 2022. In July 2022, Mulgado moved to set aside his guilty plea on the theory that he had not been properly advised of possible collateral attacks on the 2005 removal. This order follows full briefing and a three-day evidentiary hearing in which five witnesses testified. Officer Prazelini was available but did not testify.

**ANALYSIS**

A defendant may withdraw a plea of guilty after its acceptance but before sentencing if he can show a fair and just reason for requesting the withdrawal. F.R.Cr.P 11(d)(2)(B). Fair and just reasons include, among other things, "inadequate Rule 11 plea colloquies, newly discovered evidence, intervening circumstances, or any other reason for withdrawing the plea that did not exist when the defendant entered his plea." *See United States v. Garcia*, 401 F.3d 1008, 1011 (9th Cir. 2005).

"Erroneous or inadequate legal advice may also constitute a fair and just reason for plea withdrawal, even without a showing of prejudice, when the motion to withdraw is made presentence." *United States v. McTiernan*, 546 F.3d, 1160, 1167 (9th Cir. 2008). Where

defendant alleges a possible defense was erroneously omitted by counsel, defendant must show that "proper legal advice at least could have plausibly motivated a reasonable person in defendant's position not to have pled guilty had he known about [the defense] prior to pleading." *Id.* at 1168. To satisfy this standard, defendant need not prove that the defense would have been successful on the merits, but a "realistic possibility under the circumstances" must exist. *Ibid.* Here, although Mulgado does not have to show he would have won, he *does* have to show that had he received proper legal advice from Attorney Kalar regarding his chances to collaterally attack his conviction, the possibility of it would have caused a reasonable person in his position not to plead guilty. Therefore, it is important to understand what the "proper legal advice" would have been, *i.e.*, whether a plausible defense could have been mounted.

Under Section 1326(d)

> an alien may not challenge the validity of the deportation order. . . unless the alien demonstrates that (1) the alien exhausted any administrative remedies that may have been available to seek relief against the order; (2) the deportation proceedings at which the order was issued improperly deprived the alien of the opportunity for judicial review; and (3) the entry of the order was fundamentally unfair.

Because defendant's deportation order was based on expedited removal under Section 1225, which provides no opportunity for administrative or judicial review, subsections (1) and (2) are satisfied. *See United States v. Raya-Vaca,* 771 F.3d 1195, 1202 (2014) (cleaned up) (referencing 8 U.S.C. §1225(b)(1)(C) and (b)(1)(A)(i) which prohibit administrative appeal and further hearing or review during expedited removals). To satisfy fundamental unfairness under subsection (3), "the defendant bears the burden of establishing both that the deportation proceeding violated his due process rights and that the violation caused prejudice." *Ibid.* When an alien arrives at a port of entry, he "has only those rights regarding admission that Congress has provided by statute." *See Dep't of Homeland Security et. al. v. Thuraissigiam,* 140 S.Ct. 1959, 1983 (2020). Thus, to show he has a plausible basis to collaterally attack his removal under Section 1326(d)(3), defendant Mulgado must show there exists a plausible argument that

1    his 2005 expedited removal proceeding violated some statutory or regulatory right under the
2    immigration laws, and that violation caused him prejudice.

3        It is true, as the government argues, that this motion has suffered from a cascade of
4    shifting sands as one defense argument after another failed as the record has developed.
5    During the course of studying the A-File, however, one problem was never fully answered on
6    our evidentiary record and now seems, after much briefing, to be a viable ground sufficient to
7    set aside the guilty plea. This is the complete absence of an official decision by Officer
8    Prazelini regarding defendant's request to withdraw his application for admission.

9        Defendant Mulgado made a false claim to United States citizenship in violation of
10   Section 1182(a)(6)(C) and was thus subject to expedited removal proceedings. Officer
11   Prazelini, however, still had the discretion to grant defendant's request to withdraw. "An alien
12   applying for admission may, in the discretion of the Attorney General and at any time, be
13   permitted to withdraw the application for admission and depart immediately from the United
14   States." 8 U.S.C §1225(a)(4); *see also* 8 C.F.R. §235.4 (stating "[t]he Attorney General may,
15   in his or her discretion, permit any alien . . . to withdraw his or her application for admission *in*
16   *lieu of* . . . expedited removal under section 235(b)(1) of the Act") (emphasis added). The
17   difference between allowing an alien to withdraw his or her application for admission as
18   opposed to an expedited removal was critical, as the latter barred the alien from attempting to
19   enter the United States again for a period of five years. The Inspector's Field Manual called
20   for an immigration officer to consider six factors when deciding on whether or not to allow
21   application withdrawal. It stated in relevant part:

> In light of the serious consequences of issuing an expedited removal order, which includes a 5-year bar to re-entry, the decision of whether to permit withdrawal should be based *on a careful balancing of relevant favorable and unfavorable factors in order to reach an equitable decision.* Such factors might include but are not limited to (1) the seriousness of the immigration violation; (2) previous findings of inadmissibility against the alien; (3) intent on the part of the alien to violate the law (4) ability to easily overcome the ground of inadmissibility; (5) Age or poor health of the alien and (6) other humanitarian or public interest considerations.

INS Inspector's Field Manual § 17.2(a) (2007), *available at* Westlaw FIM–INSFMAN 17.2, 2007 WL 7710869 (emphasis added).

Turning to the facts of our case, defendant Mulgado requested in writing to withdraw his application for admission on the Form I-275 (US-000279). The Inspector's Field Manual called for a "careful balancing" and a "decision." From our A-file, however, we cannot see a careful balancing or a decision made by Officer Prazelini, who did not testify. We are asked to infer that there was a decision from the fact of expedited removal. There is, however, no actual document or even a single sentence that states Officer Prazelini denied defendant Mulgado's withdrawal request. Arguably, what we normally would expect to find, is a paragraph from Officer Prazelini somewhere in the A-file that he weighed the relevant factors and decided not to grant defendant's request. Thus, the problem is that an explicit request was made to withdraw his application, yet no explicit ruling on the request was made, nor was any careful weighing of the six factors explicitly made — at least insofar as the A-file reveals — leaving the plausible inference that Mulgado was walked back to Mexico without any ruling or evaluation ever having been made. The statute certainly gave Officer Prazelini discretion to deny the request, but the statute at least required the exercise of discretion.

True, as the government has argued, the Inspector's Field Manual stated a request to withdraw application should normally be denied in cases of "obvious, deliberate fraud on the part of the applicant." *Ibid*. But "normally" is not "always," and falsely claiming U.S. citizenship did not per se bar withdrawal relief — that decision remained at the sole discretion of the examining officer. *See* Inspector's Field Manual at 17.4(b) (stating "[o]nce you have made a determination that an applicant for admission is making a false claim U.S. citizenship [sic], process the case as an expedited removal case *or permit withdrawal of application of admission*.") (emphasis added). Thus, a weighing of the relevant favorable and unfavorable factors was still required even though there had been fraud. Of note, a factor weighing in defendant's favor was that he was then married to a United States citizen, and through her could have readily applied for a visa or green card. *See United States v. Bayardo-Garcia,* 590 F. App'x 660, 663 (9th Cir. 2014).

The absence of any "balancing" or "decision" is exacerbated by an error on the face of Form I-275 itself. Mulgado dated and signed his request to withdraw, which stated:

> I request that I be permitted to withdraw my application for admission and return abroad. I understand that my voluntary withdrawal of my application for admission is in lieu of a formal determination concerning my admissibility *in removal proceedings before an immigration judge*.

(US-000279) (emphasis added). The box "before an immigration judge" is checked in typewriter font, which suggests it was made by the immigration officer, not defendant. It is plausible that at the time defendant made his request, he was led to believe that if his request to withdraw were ultimately denied, he would still go before an immigration judge. Instead, he was taken out of the country. The Form I-275 also checks a box that defendant was "ordered removed (inadmissible) by an Immigration Judge – Section 235(b)(2)," but defendant did not see an immigration judge (US-000278). This is enough to create an argument that should have been investigated prior to defendant pleading guilty and it was not. It is plausible that defendant would not have pled guilty had these issues been investigated.

The government argues Form I-867A "indisputably shows" that Officer Prazelini read defendant a warning on the top of the page, which details the five-year ban defendant would face should he be removed (Dkt. No. 127 at 2). This argument is unavailing. The sworn statement merely shows Officer Prazelini stated "[d]o you understand what I've said to you?" and defendant responded "Yes." This exchange does not "indisputably" show that Officer Prazelini read the entirety of the form as required by regulation. *See* 8 C.F.R. §235.3(b)(2)(i). Nor do the questions in the sworn statement that speak to some of the six factors show that Officer Prazelini did a "careful balancing" and came to an "equitable decision" to deny defendant's request. No evidence has been produced and the record is completely silent as to what exactly was considered by Officer Prazelini and the ultimate decision to which he came vis-à-vis defendant's request to withdraw his application.

Had this discrepancy been identified by defense counsel and discussed with defendant, it is plausible that they would have postponed pleading guilty until after counsel had further

9

1    investigated and/or tested it via a motion to dismiss.  This is not to say that any such motion
2    would have been successful (or not successful).  But they are enough to constitute a "fair and
3    just reason" within the meaning of Rule 11, given that a defendant need only show that a
4    collateral attack under Section 1326(d) at least could have plausibly motivated a reasonable
5    defendant in his position not to have pled guilty.  *See McTiernan*, 546 F.3d at 1167.  Further,
6    this order notes that there are other procedural glitches on the face of the A-file, such as the
7    absence of defendant's signature on the reverse of the Form I-860 (which was required by
8    regulation), and the goof in the total-pages number on the Form I-867B Jurat, but the foregoing
9    is worth granting the motion to withdraw on its own.

10   The Court is much troubled by defendant's absconding as a fugitive for 30 months.
11   Our court of appeals has looked to a defendant's delay in moving to withdraw his plea as "a
12   barometer of the defendant's candor to the court about his reason for withdrawal." *Garcia,* 401
13   F.3d at 1013.  This alone would possibly be enough to deny the motion.  *See United States v.*
14   *Nostratis*, 321 F. 3d, 1206, 1211 (denying a defendant's motion to withdraw due in part to his
15   unjustified two-year delay between entering his plea and moving to withdraw); *United States v.*
16   *Hatcher*, No. CIV. 92-1 WBS, 2009 WL 1604694, at *2 (N.D. Cal. June 5, 2009), aff'd, 414 F.
17   Appx'x 944 (9th Cir. 2011) (Judge William Shubb) (denying guilty plea withdrawal after the
18   defendant's absconding because "[a] defendant should not be allowed directly to benefit from
19   his own deliberate decision to flaunt the court's orders . . . ."); *United States v. El-Gheur,* 201
20   F. 3d 90, 94 (2nd Cir. 2000) (reasoning after absconding, any remedies defendant arguably
21   may have had are forfeited).

22   Nevertheless, the Court will allow withdrawal of the guilty plea.  If the 2005 removal
23   order was defective, then it was not cured by the absconding, which should be dealt with by a
24   separate charge of obstruction of justice or other appropriate charge.  The government has not
25   identified any prejudice flowing from the delay.

**CONCLUSION**

Defendant's guilty plea is **VACATED**. A trial date will be set at the next hearing. Any motion to dismiss the indictment must be made by **JANUARY 10, 2023**, with an opposition by **JANUARY 24, 2023**, and a reply by **JANUARY 31, 2023**. A hearing will be on **FEBRUARY 7, 2023, AT 8 AM**. Thereafter an evidentiary hearing will be likely on **FEBRUARY 28, 2023, AT 8 AM** and Officer Prazelini should testify in-person to explain what happened and why. The government's opposition should include declaration(s) on those points. The record for any motion to dismiss and oppositions must be fresh declarations, except any evidence admitted in our previous evidentiary hearing may be used. Please do not move for extensions of the above schedule without very good cause.

**IT IS SO ORDERED.**

Dated: December 23, 2022.

_____
WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE